J-S05044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF S.N.L., A MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.L., NATURAL FATHER | No. 1646 WDA 2014 |

Appeal from the Decree entered September 22, 2014,
in the Court of Common Pleas of Fayette County, Orphans'
Division, at No: 18 ADOPT 2014

BEFORE:  DONOHUE, SHOGAN, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                **FILED APRIL 06, 2015**

E.L. (Father) appeals from the decree entered September 22, 2014, in the Fayette County Court of Common Pleas, which involuntarily terminated his parental rights to his minor daughter, S.N.L. (Child).  We affirm.

Child was born in Fayette County, Pennsylvania, in September of 2008.  At the time of Child's birth, Father was residing with Child's mother, C.D. (Mother).  When Child was about a year old, Father, Mother, and Child moved to Virginia.  However, Father left Virginia after approximately one month and returned to Fayette County.  Mother and Child returned to Fayette County in 2010.

On May 12, 2014, Mother filed a petition to involuntarily terminate Father's parental rights to Child.  In the petition, Mother indicated that Father was presently incarcerated in Lehigh County.  Father responded by mailing letters, dated June 8, 2014, to Mother's counsel, the orphans' court, and to the orphans' court clerk.  In the letters, Father confirmed that he was

incarcerated, and requested that his parental rights not be terminated. A termination hearing was held on August 14, 2014, during which the court heard the testimony of Mother and her fiancé, L.R. (Fiancé). At the beginning of the hearing, Father's court-appointed counsel indicated that he had attempted to get in contact with Father, but that he had not been able to do so until that morning. N.T., 8/14/14, at 3-4. While Father did not participate in the hearing, Father's counsel did participate, and cross-examined Mother. At the conclusion of the hearing, the court requested that an additional hearing be scheduled so that Father could have the opportunity to testify. *Id.* at 24-25. The hearing was held on September 16, 2014, during which Father participated remotely using a videoconferencing system. Mother was recalled to the stand as a rebuttal witness following Father's testimony.

On September 22, 2014, the orphans' court entered its decree terminating Father's parental rights. Father timely filed a notice of appeal on October 7, 2014, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now raises the following issue for our review.

> Did the [t]rial [c]ourt err by abusing its discretion in terminating [Father's] rights as [Mother] failed to sustain [her] burden of proof by clear and convincing evidence to show that [Father] evidenced a settled purpose of relinquishing a settled claim to the child or refused or failed to perform parental duties?

Father's Brief at 6.

- 2 -

J-S05044-15

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 3 -

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1)-(2), (b).

We need only agree with the orphans' court as to any one subsection of Section 2511(a) in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.

Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1).[1]

To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). **Id.** (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development

---

[1] Because Father only challenges the orphans' court's analysis with respect to Section 2511(a)(1), we need not consider whether the court abused its discretion by finding that termination was warranted under Section 2511(b). **See In re Adoption of R.K.Y.**, 72 A.3d 669, 679 n.4 (Pa. Super. 2013), *appeal denied*, 76 A.3d 540 (Pa. 2013) (declining to address Section 2511(b) where the appellant did not make an argument concerning that section). Additionally, we note that the orphans' court was only permitted to terminate Father's parental rights if it found that an adoption of Child was anticipated. **In re E.M.I.**, 57 A.3d 1278, 1285 (Pa. Super. 2012); 23 Pa.C.S.A. § 2512(b). Generally, an individual may not adopt the child of a non-spouse unless that non-spouse relinquishes his or her parental rights, or unless the individual and the non-spouse are able to show cause pursuant to 23 Pa.C.S.A. § 2901. **In re Adoption of R.B.F.**, 803 A.2d 1195, 1199-1202 (Pa. 2002). Here, Father does not challenge the feasibility of Fiancé's proposed adoption of Child. Thus, we express no opinion on the issue whether cause was shown to permit Mother's fiancée to adopt Child.

of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975)).

Instantly, the orphans' court found that Father had abandoned Child prior to being incarcerated in 2011, and that he made almost no effort to maintain a relationship with Child thereafter. Orphans' Court Opinion, 10/24/14, at 6-7. Thus, the court concluded that Father had refused and failed to perform his parental duties for a period of four years prior to the filing of the petition to terminate his parental rights. *Id.* at 7. Father argues that his efforts at parenting Child were hampered by Mother. Father's Brief at 11. Father also contends that Mother made no effort to make Child available to Father, that Mother made no effort to keep in

contact with Father, and that Mother "left the jurisdiction where they last resided together." *Id.*

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion. At the August 14, 2014, termination hearing, Mother testified that she and Fiancé have been together for nearly four years, and that they have a child, L.R., who also resides with them. N.T., 8/14/14, at 6, 11. Mother testified that the last time she had any contact with Father about Child was in November of 2009, when Father spoke to Mother over the phone and sent her a "twenty dollar money order that said it was child support." *Id.* at 8. Mother testified that, upon returning to Fayette County in 2010, she and Child first lived with her grandmother. *Id.* at 9. According to Mother, Father knew Mother's grandmother, as well as Mother's other family members in the area. *Id.* However, Father made no effort to contact Mother or Child. *Id.* Mother testified that she received a message from Father's mother in December of 2009, indicating that Father would not be in contact with Child during the Christmas holiday because he had been incarcerated. *Id.* at 15. This resulted in an argument between Father's mother and Mother. *Id.* Mother stated that she has not been in contact with Father's mother since. *Id.* Mother also testified that she had not paid Father to stay away from Child, or threatened him. *Id.* at 10.

Fiancé testified that he has never received a phone call from Father or received any financial support for the care of Child from Father. *Id.* at 22. He stated he has never seen or spoken to Father, and that he never threatened Father to keep him away from Child. *Id.* Fiancé indicated that he wanted to adopt Child, stating, "Like she is my daughter. She is one of my best friends." *Id.* at 22. Following Fiancé's testimony, at the conclusion of the August 14, 2014, hearing, the orphans' court admitted into evidence the letter that Father sent in response to Mother's petition to terminate his parental rights. *Id.* at 24. In the letter, Father admitted that he was active in Child's life for "almost the first two years," but that, "[d]ue to my prior immaturities and a failed relationship with [Child's] mother, I lost the bond I had with my daughter." Petitioner's Exhibit 1.

During the September 16, 2014, hearing, Father testified that he is facing a first degree felony aggravated assault charge, and that he plans on pleading guilty and serving a prison sentence "in the near future." N.T., 9/16/14, at 4-5, 19-20. Father admitted that his relationship with Mother ended "around May of 2009," and that he had only seen Child once since that time. *Id.* at 6-7. Father stated that, around or shortly before November of 2009, he had Child in his care in Fayette County for about five or six days. *Id.* at 7, 13.

Father explained that he moved to Lehigh County in early 2010. *Id.* at 8. He claimed that "from early 2010 to mid 2010" he sent Mother twenty

dollars each week and called "almost every other day." *Id.* Father also stated that he obtained a job in May of 2010 and sent Child letters and a pair of shoes. *Id.* at 14. Father testified that he and Mother had agreed that Father's aunt would transport Child to Lehigh County, but that Mother rejected this idea at the "last minute." *Id.* at 8. Father stated that he last spoke with Mother about Child when he visited Fayette County in May of 2011. *Id.* at 8-9. Father alleged that he called Mother, and that Mother told him that he would never see Child again. *Id.* at 9.[2] Father explained that he was then incarcerated in Lehigh County for drug possession from August 4, 2011, until July 28, 2013. *Id.* at 9, 15. He stated that he lost track of Mother's whereabouts after his incarceration. *Id.* at 22. Father testified that he sent a card for Child to Mother's aunt in 2012 because it was "the only address I knew of [Mother's] family." *Id.* at 15, 21.

Father stated that he was again incarcerated on January 30, 2014. *Id.* at 9. Father claimed that, prior to this second period of incarceration, he had "no clue" where Mother and Child were and had "no way of getting in contact with them through social media or her family." *Id.* at 16. Father asserted that he spoke with to Child's "little cousin . . . . maybe once or twice over social media to ask him about [Child]." *Id.* at 9-10. Reportedly, the cousin stated to Father that he did not know where Mother was living

---

[2] Father later claimed on re-cross examination that Mother made this statement in "early, mid 2010." N.T., 9/16/14, at 23. Reportedly, Mother became angry at Father after he missed some of his scheduled phone calls with Child. *Id.*

"because she wasn't in immediate contact with the family." *Id.* at 10. Father indicated that he wanted a chance to reconnect with Child, and suggested that he could do this by writing to Child "on occasion, whenever necessary," by sending her a picture, by sending financial support, and by talking on the phone. *Id.* at 11.

After being recalled as a rebuttal witness, Mother denied that she spoke to Father at any point after December of 2009. *Id.* at 26.[3] Mother agreed that Father wanted Mother to send Child to Allentown with an aunt, but that she rejected Father's plan because she "did not know about their whereabouts . . . ." *Id.* She further denied that Father was ever scheduled to call Child every day, that he ever did call Child every day, that he sent her money more than once, that she ever had an argument with him over the phone, and that she told him that he would not see Child again. *Id.* at 27. Mother stated that she did not receive gifts from Father or his family, other than "a box" from Father's mother in 2009. *Id.* at 28.

Mother also testified that, during the approximately six months when Father was out of jail between July of 2013 to January of 2014, she was still living with her grandmother in Uniontown. *Id.* at 29. She stated that this was the same house where she was residing when Father first met her. *Id.* Mother indicated that she did not know what cousin Father allegedly contacted via social media, but that she always kept in touch with her

---

[3] This was slightly inconsistent with Mother's earlier testimony that she last spoke with Father about Child in November of 2009. N.T., 8/14/14, at 8.

family, and that her family was aware of her address after she moved out of her grandmother's home. *Id.* at 28-29.

Accordingly, the record supports the orphans' court's determination that Father refused or failed to perform parental duties during the six months prior to the filing of the termination petition on May 12, 2014. Indeed, Father did not testify that he made any attempts at contacting Mother or Child during this period. At best, Father indicated that he contacted Child's cousin sometime between July of 2013 and January of 2014. This minimal effort by Father is insufficient to preserve his parental rights. While Father now complains that Mother did not exert herself to make Child available to him, it was Father's duty, not Mother's, to ensure that he maintained his parent/child relationship. *B.,N.M.*, 856 A.2d at 855. While Father testified that Mother was resistant to his attempts at contacting Child in 2010 and 2011, the orphans' court was free to reject this testimony as not credible. Even if Father's statements were accurate, Father was required to make a good faith effort in face of this resistance in order to retain his parental rights. *Id.* He did not do so.

Thus, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights pursuant to Section 2511(a)(1), we affirm the decree of the orphans' court.

Decree affirmed.

Judge Donohue joins the memorandum.

Judge Shogan files a concurring memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/6/2015